# Exhibit 1

 1    1971.  So even though I was in a program that would

 2    have taken me through Ph.D., I saw no point to it.

 3         Q.   And how many -- how long did you attend the

 4    University of Florida before you dropped out?

 5         A.   Four years.

 6         Q.   So you dropped out how close to graduation?

 7         A.   I've been told I lack about four credits.

 8         Q.   Do you have copies of your transcripts from

 9    the University of Florida?

10         A.   No.

11         Q.   What kind of grades did you have?

12         A.   B's primarily.  I think it was a B average.

13         Q.   Do you know what your grade point average

14    was at the time you dropped out?

15         A.   I think it was about three one, 3.1, but

16    that's memory from 40 years ago.

17         Q.   All right.  And do you have any other formal

18    education?

19         A.   I attend training programs for my field, but

20    I don't know if you would consider that formal or

21    semi-formal.

22         Q.   Like continuing education --

23         A.   That's correct.

24         Q.   -- for, like, certain certifications or --

25         A.   That's correct.

1    start thinking about it.

2        Q.    And when you say reverse engineering,
3    relating to what?

4        A.    I solve problems for companies.  For
5    instance, when a tobacco company was having a problem
6    on their productions for high-rate machines making
7    cigarettes, I came up with new designs for several
8    parts of their machines that could be able to function
9    at production rates of up to 18,000 units per minute.

10       Q.    Have your expert opinions ever been excluded
11   by a court, to your knowledge?

12       A.    To my knowledge, never.

13       Q.    Have you ever not been qualified as an
14   expert when you were proffered as an expert in any
15   case, to your knowledge?

16       A.    I have always been accepted as an expert in
17   every single case that I have ever been retained on
18   where that question came up.

19       Q.    All right.  And what is your education,
20   experience, or training that, in your view, qualifies
21   you as an expert on the firearms and ballistics topics
22   that you've got on your resume?

23       A.    That is a very broad cut.  Basically, I have
24   40 years' experience in this field, more than 40.  To
25   be specific, I have 44 years' experience in the field.

1                    I was first licensed as a gunsmith when I

2      turned 21, and I had been working as an apprentice

3      before that.  I have been in the firearms field my

4      entire life, I should say my entire business life; and

5      that experience, since there are no degrees in

6      gunsmithing and there are no degrees in firearms

7      technology, this field is entirely experience based.

8           Q.    So no formal education in the area of these

9      firearms topics, right?

10          A.    Obliquely, yes, there is formal training

11     because if I didn't have the math skills, the

12     chemistry skills, the materials skills, I wouldn't

13     have been able to do my job in the firearms field.

14          Q.    You're talking about general engineering

15     principles, right?

16          A.    That's correct.

17          Q.    Nothing specific to firearms, though?

18          A.    There is no specific training for firearms.

19          Q.    With whom did you apprentice as a gunsmith?

20          A.    It was a small hardware store in

21     Gainesville, Florida, and I worked there part time

22     when I was a student, and I'd have to remember the

23     name.  I just don't remember it right offhand.

24          Q.    Did the hardware store make guns?

25          A.    No.  Repaired.

1        Q.    And what does a gunsmith mean?

2        A.    Someone who -- in my definition, it's

3    someone who repairs, modifies, upgrades a firearm.

4        Q.    Have you ever made a gun for sale to the

5    public?

6        A.    No.

7        Q.    Have you ever made a gun, period?

8        A.    Yes.

9        Q.    Prototype?

10       A.    Prototype.

11       Q.    Tell me about that.

12       A.    I invented the polymer firearm.  Had four

13   patents on it.  Of course, I was curious would it

14   work.  General Electric was nice enough to supply me

15   with some raw material, which I modified and used some

16   of the things that I had in my patent, and I went to

17   the range and went to shoot it.  That would be an

18   example --

19       Q.    Did you ever attempt to --

20       A.    -- as I testified to Congress on that.

21       Q.    This would have been in the 1980s?

22       A.    That's correct.

23       Q.    And that had to do with airport security

24   issues?

25       A.    That was a separate issue.

63

1     Q.    Okay.

2     A.    One of the things that I determined when I
3    invented the plastic gun was the corollary that it
4    could be used by nefarious people, and so I
5    immediately donated to public domain my patent on how
6    to make polymer weapons observable on machines like
7    airport detectors of different types and I testified
8    to Congress and also lobbied heavily for a law that
9    would regulate firearms so that they would have to be
10   identifiable.

11    Q.    And how did you make your polymer prototype
12   handgun identifiable by weapon detection devices?

13    A.    I worked with a professor at Harvard by the
14   name of Paul Horowitz.  We came up with ten different
15   ways to do it, and that is in the public domain,
16   everything from adding chemicals to the polymer
17   structure to make them look X-ray opaque to adding
18   chips to basically make them passive generators of a
19   signal so that they could be identified, and I caught
20   hell from NRA about that.

21    Q.    You said that the airport security issue was
22   separate from the time you were actually referring to
23   where you testified to Congress.  So tell me --

24    A.    No, no, no, no, no.

25    Q.    Okay.

74

1    of ten feet could not be distinguished from a genuine

2    firearm and that the teenager that was holding it was

3    killed by a police officer because he didn't react

4    properly. He said, "But it's a toy, officer," and the

5    officer shot him.

6         Q.   And so ---

7         A.   And by the way, in that particular case the

8    officer was at the scene of a dwelling area for a

9    different purpose. He just came across the child who

10   was plinking with his cousin using BB's.

11        Q.   Were your opinions critical of the police

12   officer as well as the product manufacturer?

13        A.   No.  Police officer did his job.  There was

14   no way he could distinguish that it wasn't a real gun.

15        Q.   And did that case go to verdict?

16        A.   I don't know.

17        Q.   You don't know the outcome?

18        A.   I don't know the outcome.  I testified after

19   the chief of police of Detroit and then we both left

20   town.

21        Q.   Have you ever been retained as an expert or

22   even a consulting expert in a case relating to a

23   holster?

24        A.   Obliquely when I was with the Casselberry,

25   Florida, Police Department as a range officer and

1   firearm training officer, I had to advise on holsters.

2   So I guess you could say that that was an expert

3   retainment of sorts.

4       Q.   When was that?

5       A.   That was in the 1970s.

6       Q.   And you say you were retained to advise on

7   holsters?

8       A.   I said that I was the firearms training

9   officer and range officer, and part of my duties was

10  to advise on anything -- any equipment dealing with

11  firearms, and holsters, of course, is an important

12  piece of equipment for police officers.

13      Q.   So as part of your job as a firearms

14  training officer and range officer for the Casselberry

15  Police Department in the 1970s, you would have

16  generally had conversations with people about handguns

17  and holsters?

18      A.   Oh, yes.

19      Q.   Anything specific come to mind?

20      A.   Just general.  I've dealt with holsters

21  basically my entire career because it's rare to see a

22  handgun not make it to a holster.

23      Q.   Other than the general advice that you might

24  have given as the firearms training and range officer

25  in the 1970s, are there any other occasions where you

1    were paid to give somebody your expert opinion on a
2    holster?

3        A.    I'm taking your statement as paid meaning
4    that I received remuneration in one way or another; am
5    I correct on that?

6        Q.    Retained.

7        A.    Well, you said paid.

8        Q.    Yeah.

9        A.    Okay.  So retail sales would have paid me a
10   profit every time I sold a holster and handgun
11   combination or singly.  I've done that over the years
12   countless times.  I even -- in my retail store, when I
13   had one, I even used to sell Safariland's predecessor
14   Bianchi's holsters.

15           I've taught about the combination of
16   handguns and holsters at Seminole Community College,
17   now Seminole State College, when I had my course on
18   gunsmithing there; the same thing at Santa Fe Junior
19   College, now Santa Fe State College, when I had my
20   course there.  So those are instances where I would be
21   paid for my knowledge about holsters.

22       Q.    Okay.  Tell me about what your -- the name
23   of your resale -- retail store and where it was.

24       A.    It was called D. Byron Gunsmith and it was
25   located in Casselberry, Florida, and that was the

1    a gun store would carry and sell.

2         Q.   Okay.  And was that a company that was

3    incorporated?  Was it a sole proprietorship?

4         A.   It was a partnership.  And our primary

5    clientele or -- even though it was the general public,

6    most of our business came from police, and we were --

7    we were even the repair depot for the Orlando Police

8    Department.

9         Q.   All right.  So you sold new and used

10   handguns.  What other types of products did that store

11   sell?

12        A.   Reloading supplies, ammunition, holsters,

13   accessories, cases, virtually anything that had to do

14   with firearms for the public and primarily for law

15   enforcement use.

16        Q.   And in addition to the sale of those goods,

17   what other business did the store do, if any?

18        A.   Well, gunsmithing encompasses an awful lot.

19   We did a lot of firearms customization.  We built the

20   sniper rifles for many police departments around here,

21   as an example.  I didn't consider that to be a

22   manufactured firearm, for the question earlier,

23   because I want to differentiate.  That was a modified

24   firearm.

25        Q.   Okay.  So you were in the business of

1    carriers for firearms. That's a totally separate

2    issue.

3        Q.    But you didn't make them, did you?

4        A.    I don't know that my company didn't.

5        Q.    You didn't?

6        A.    I personally did not.

7        Q.    So in answer to my question of were you

8    certified in holster design, the answer is no, right?

9        A.    But just to be clear, I don't know of any

10   certification body that would certify it.

11       Q.    Okay.

12       A.    So even if I wanted to make and design a

13   holster from scratch, I don't know who would certify

14   it.

15       Q.    And you've never tried to make a holster

16   from scratch?

17       A.    Yes, I have.

18       Q.    Okay.

19       A.    I worked with Avanti Holster, which was a

20   small startup, in advising them on a very unusual type

21   of shoulder holster -- and this, once again, goes back

22   to the '70s -- that was extremely flat and made for

23   small-frame revolvers; and unlike other shoulder

24   holsters, it had a single elastic band that retained

25   it in place rather than a series of either

1          A.    The NRA ones, I don't believe they expire.

2    I don't know about the state.  I'll have to look that

3    up.  But that's something I can look up.

4          Q.    You specifically, you know, mentioned that

5    you're certified as an instructor as to different

6    types of firearms, right?

7          A.    That's correct.

8          Q.    You mentioned that firearms go in holsters,

9    right?

10         A.    Handguns do.

11         Q.    Is there any particular part of your

12   training to become certified as a firearms instructor

13   relating to holsters specifically?

14         A.    As I said, most firearms training in the

15   United States is ad hoc.  I received mine through the

16   police departments and also as -- my experience as a

17   gun store owner and someone who sells holsters and

18   someone who uses them.  So, I mean, experience is the

19   primary teacher.

20         Q.    Your certification as an instructor relates

21   to the firearms themselves, though, not to holsters,

22   right?

23         A.    Split that off.  You have the NRA

24   certifications, which is primarily firearms.

25         Q.    Okay.

1        A.    Of course.

2        Q.    And particularly for a user of this holster

3    that's in law enforcement, is it important to be able

4    to remove and reholster the handgun without having to

5    look down at the holster?

6        A.    Yes.

7        Q.    And would you agree that if your design

8    interferes with the process of removing or

9    reholstering the handgun that that would be a problem?

10       A.    If my design would interfere, yes; but, my

11   design won't.

12       Q.    Okay.   What analysis have you done to

13   confirm that it will not?

14       A.    I've thought about it.   I have a very good

15   mind for that sort of thing and, as I said, that's

16   what I do on the manufacturing side or design side for

17   other products.

18       Q.    And do you have specifically in mind, you

19   know, what the additional mechanism, the gear that you

20   refer to, you know, how that would function so that

21   when you rotate the SLS strap one direction that gear

22   causes your proposed strap to rotate the other

23   direction?

24       A.    Yes.

25       Q.    Can you describe that for me in a way

1      A.    That's correct.

2      Q.    Have you actually performed any calculations
3    on those issues?

4      A.    Mentally, yes.

5      Q.    Okay.  Other than in your head?

6      A.    No.  I've written nothing down.

7      Q.    Okay.

8      A.    However, when I had Vintage Industries, I
9    used to quote an awful lot of tooling, and in that
10   business if you mess up on a quotation for tooling,
11   you've destroyed your profit margin.

12     Q.    Well, have you tried to determine, you know,
13   what materials you want to use, what they would cost,
14   who would you -- whom you would buy them for and, you
15   know, how much of that you would have to buy and, you
16   know, how many units that could be used for and what
17   the labor would be associated with it and what the
18   cost per unit is?

19     A.    That and other hidden costs, yes.

20     Q.    You've done all that in your head?

21     A.    In my head.

22     Q.    Okay.  But have you contacted anybody to --

23     A.    No.

24     Q.    -- determine what the cost of supplies would
25   be?

1      A.    No, it does not.

2      Q.    So it's fair to say that?

3      A.    Yes, it is fair to say that.

4      Q.    All right.  You talked earlier about Cosmi

5   Corporation?

6      A.    Yes.

7      Q.    Was that a company that you did business

8   with or that you were employed by?

9      A.    Both.  I started out as an independent

10  vendor supplying them software and then they hired me

11  as -- I had a lot of titles.  Director of publishing

12  administration, I think, was my last one.

13     Q.    Okay.  And your work there related to --

14     A.    Software.

15     Q.    -- computer software?

16     A.    Software.

17     Q.    Is it fair to say that the work of that

18  company does not relate to weapon retention or

19  holsters?

20     A.    It has nothing to do with weapon retention

21  or holsters.

22     Q.    Have you worked with a company named Vintage

23  Industries, Inc.?

24     A.    Yes, I have.

25     Q.    What business is that company in?

1      A.    That company was an injection molding and

2   tool and die making company.

3      Q.    And what was your job at that company?

4      A.    Chairman and CTO.

5      Q.    And did that company make products --

6      A.    Yes, it did.

7      Q.    -- for commercial sale?

8      A.    Yes, it did.

9      Q.    And what products did it make?

10     A.    Mostly firearm-related products.  Everything

11  from grips and stocks to sights and components.

12     Q.    And any particular types of firearms?

13     A.    Everything from handguns to components for

14  shoulder-fired missiles.

15     Q.    And is that company still in operation?

16     A.    I'm not sure.

17     Q.    Okay.  Are you still associated with that

18  company?

19     A.    No, sir.

20     Q.    When did you cease being employed by that

21  company?

22     A.    We sold out, I think it was around 2001,

23  2002.

24     Q.    Who did you sell to?

25     A.    I think their name was Ogle Dana Solutions

 1   written test --

 2       A.   Yes.

 3       Q.   -- and some type of sign-off from another

 4   instructor?

 5       A.   Yes.

 6       Q.   Your teaching on law enforcement gunsmithing

 7   and ballistics, we already talked about that.  That

 8   would have been in the 1970s, correct?

 9       A.   That's right.

10       Q.   You've never been certified as an instructor

11   in holster design, have you?

12       A.   Only insofar as the design of the holster

13   impacted what I was instructing.

14       Q.   You're going back to the concealed weapons

15   permit and how they fit together?

16       A.   And also in general as a police firearms

17   instructor and range officer.

18       Q.   And -- but you've never been certified as an

19   instructor in how to design a holster?

20       A.   If you mean like down to the blueprints and

21   how to make everything, there's two components to that

22   question.  One is certification.  And, as I said, I

23   don't know of any certification body.  The second

24   thing is, how to make.  I had a plastic injection

25   molding company.  We can make anything, including

 1      A.    Some yes, some no.  I've got most of the

 2    names of the companies that have made holsters as well

 3    as a lot of other accessories for firearms.  I do not

 4    have a good compendium of their product line.

 5      Q.    If the information in the database related

 6    to holster manufacturers is something that we wanted

 7    to have a look at for purposes of this case only,

 8    would that be something that you would allow?

 9      A.    Sure.

10      Q.    Okay.

11      A.    As long as we have some sort of agreement

12    that it can't be published or redistributed.

13      Q.    Okay.  Is there any information in that

14    database that you have consulted or reviewed in

15    relation to your work in this case?

16      A.    No.

17      Q.    Your resume says that you designed and

18    manufactured component parts used in original

19    production firearms for a number of companies, right?

20      A.    That's correct.

21      Q.    One of those is Colt.  What have you

22    designed and manufactured for Colt?

23      A.    Oh, let's see.  Starting with grips, when

24    they reissued the Detective Special, I actually did

25    the engraving for the molds for that and also designed

1    the grip itself.

2         The sights on the revolvers, most people

3    thought they were metal.  They were actually made out

4    of plastic.  We made them.  I designed those.

5         They were having a problem during the

6    assembly of Colt firearms where the people doing the

7    hand polishing would over-polish, and I constructed

8    destructive jigs so that they would protect the steel

9    part of the firearm and destroy the jig instead of

10   harming production stuff.  So I did that for their

11   manufacturing process.

12        What else did we do for Colt?  We did grips

13   for a lot of their different model guns.  We made

14   different manufacturing setups for them similar to the

15   polishing jigs.  There are probably other things that

16   we made for Colt.

17        Q.   And which company were you working for when

18   you did that?

19        A.   Vintage.

20        Q.   And all the design and manufacture of

21   component parts for original production firearms would

22   have been through your work for Vintage?

23        A.   That's right.

24        Q.   Okay.

25        A.   That's where we actually made production

1   parts that went into the guns that were sold over the
2   counter.

3        Q.   Similarly, can you give me an overview of
4   the types of parts that you designed and manufactured
5   for Winchester?

6        A.   Sure.  Stocks and butt plates, grip caps.
7   Did we do anything else for Winchester?  I think we
8   made some internal components that went into their
9   lever-action rifle, but I have to look up -- I'd have
10  to look that up.  I -- I'm not sure if it was
11  Winchester or one of their competitors or both, but I
12  know that we made internal components for lever-action
13  rifles.

14       Q.   Tell me about the component parts that you
15  designed and manufactured for Savage.

16       A.   Oh, let's see.  The stocks for shotguns as
17  well as rifles, butt plates, grip caps.  They had a
18  pistol, basically a competition and hunting
19  single-shot pistol, and I think they had a magazine
20  version also, and that needed a very specialized kind
21  of stock, and I helped design that as well as
22  manufacture it.  That was the primary stuff for
23  Savage.

24       Q.   All right.  And what about -- same question
25  as to Mossberg.

1        A.    Mossberg:  Stocks, butt plates, grip caps.

2    I think we also made some internal parts for their

3    shotgun, but I'd have to go back and look.

4        Q.    Okay.  What about -- same question as to

5    Marlin.

6        A.    Same thing, but I'm not sure that we made

7    any internal parts for them.

8        Q.    And then you say that you designed and

9    manufactured component parts for original production

10   firearms for other companies that are not specifically

11   named.  Would those have been the same types of parts

12   that you've mentioned for these, the specific entities

13   that I just asked you about?

14       A.    Similar.  Like, for instance, for Smith &

15   Wesson and then later for Charter Arms, I designed

16   ergonomic grips that went on their firearms.

17       Q.    Okay.  Have you ever published, written a

18   published work, about --

19       A.    I'm sorry.  What was that last word?

20       Q.    Work.

21       A.    Oh, work.  Okay.

22       Q.    -- about holster design, how to design a

23   holster?

24       A.    No.

25       Q.    Have you ever written a published work about

1   I'm always asked questions about safety of the

2   equipment, which is why I jumped up and down when I

3   found out what this person was doing with 3D printers.

4           I have a very strong feeling about making

5   sure that things do what they're supposed to do and

6   not do what they shouldn't do, whether it's holsters

7   or firearms or something in between.

8           Since I've been involved in manufacturing,

9   like for the last 30 years, to me, I look at all of

10  the firearm accessories which have to work together

11  and I look at it as a whole entity and I look at it

12  also in terms of how do you make the stuff and what

13  are better ways to make things.  I know that was

14  somewhat rounded out, but I hope it was responsive.

15      Q.   Have you ever testified as an expert

16  regarding holster design or holster warnings before

17  this case?

18      A.   No, I haven't.

19      Q.   Have you ever been retained as an expert

20  witness on the topics of holster design or holster

21  warnings before this case?

22      A.   Yes.  I've had in my career a couple of

23  cases of accidental shootings that were related to

24  holsters and their design, and in both of those cases

25  my determination was that the accidental shooting was

1    the fault of the user, not the holster design.

2        Q.   Can you tell me as much as you can recall

3    about these couple of accidental shootings cases?

4        A.   Yes.   I was called by a plaintiff attorney

5    on one police officer that shot himself in the leg,

6    and he -- the attorney wanted to say that it was the

7    fault of the holster design.   I looked at it and I

8    could not determine any problem with the design, and

9    finally in questioning the plaintiff, during my

10   background check, I found that when he holstered the

11   firearm, his finger was within the trigger guard, and

12   so the holster caught the leading edge of his finger

13   which, of course, discharged the firearm.   So I found

14   that that was a training issue and the fault of the

15   person, not the fault of the holster.

16       Q.   Before you go to the second one, can I ask

17   you a few questions about that one?

18       A.   Sure.

19       Q.   Do you remember approximately when it was

20   that you consulted on that case?

21       A.   That was during 1980s.

22       Q.   Do you remember what type of handgun and

23   holster were involved?

24       A.   I believe it was a Smith & Wesson revolver,

25   and I do not remember which holster manufacturer it

David E. Byron 7/3/2014

84

1   was.

2        Q.   Okay.  And was that a lawsuit that was

3   brought or were you consulted by the plaintiff's

4   attorney to determine whether there was a basis for a

5   lawsuit?

6        A.   I was consulted to see whether there was a

7   basis for a lawsuit.

8        Q.   And your opinion was no?

9        A.   That's correct.

10       Q.   Do you know whether a lawsuit was ultimately

11  brought or not?

12       A.   No, I don't.

13       Q.   Do you remember the name of the attorney?

14       A.   No, I don't.

15       Q.   Do you recall what the plaintiff's criticism

16  of the holster was?

17       A.   No, I don't.  I was asked a general

18  question, why did this accident occur and was it the

19  fault of the holster.

20       Q.   So no real criticism was articulated, to

21  your recollection?

22       A.   No.

23       Q.   And your determination was that there was no

24  defect in the holster --

25       A.   That's correct.

1       Q.    -- but that the user was just not following
2    proper procedures?

3       A.    That's correct.

4       Q.    All right. And then you said there was one
5    more case. You said there were a couple of accidental
6    shootings and you talked about one of them. Can you
7    tell me about the other that you recall?

8       A.    Actually, there were two. I was thinking
9    about it as we were talking. Another one was a police
10   department contacted me to determine the reason that
11   one of their officers had been shot, and I came to the
12   same conclusion as the case that I just related.

13            There was another case in Georgia, which was
14   also an accidental shooting, and I was asked what
15   caused it. My recollection on that case is that the
16   holster was at fault but it was a military surplus
17   firearm and a military surplus holster and they were
18   not matched; and so, when they put the firearm in the
19   holster, the design of the holster, since it was not
20   matched to the firearm that they put it in, caused it
21   to discharge.

22       Q.    Something about the way that they fit
23   together caused the holster to impinge on the trigger?

24       A.    That's correct. But, once again, it was not
25   the fault of the holster, firearm, or anybody other

1   than the person that put them two -- the two items

2   together.

3       Q.   And in this Georgia case who retained you?

4       A.   It was similar to the first case.  An

5   attorney called me and --

6            (Cell phone interruption.)

7            THE WITNESS:  I apologize.

8            MR. KUPPENS:  Let's take a break.  We're off

9       the record.

10           (Brief break.)

11           MR. KUPPENS:  Back on the record.

12  BY MR. KUPPENS:

13      Q.   So Mr. Byron, we were talking about the -- I

14  think you've identified three, now, cases in which you

15  were consulted that were related to holster design,

16  and you've talked about the plaintiff's attorney in

17  the 1980s who asked you to evaluate a case in which a

18  police officer shot himself in the leg and you found

19  no defect with the holster, correct?

20      A.   That's correct.

21      Q.   And then you said there was a police

22  department that asked you why an officer shot himself

23  and to evaluate what happened, and similarly, you

24  found that it was user error, you found no defect with

25  the holster?

1        A.      That's correct.

2        Q.      What police department was that?

3        A.      I have been trying to remember.  I've got to

4    probably go back into the archive because it was about

5    20 years ago.

6        Q.      So that would have been in the '80s also?

7        A.      I think it was the late '80s.

8        Q.      Okay.  And that was a situation where you

9    would have just given your findings in a verbal

10   download?

11       A.      That's correct.

12       Q.      No written report on that?

13       A.      No.

14       Q.      And then the Georgia case, who is it that

15   you consulted with on that?

16       A.      Once again, that was in the early '90s.  It

17   was an attorney who was interested in, of course,

18   whether or not he had a suit, and my opinion also in

19   that case was that he had no suit.

20       Q.      And, to your knowledge, none of those three

21   matters involved actual lawsuits?

22       A.      That's correct.

23       Q.      All right.  So we started down this line of

24   questioning with me trying to identify matters in

25   which you have offered opinions that relate to holster

1    design or holster warnings, right?

2         A.   That's right.

3         Q.   And we talked about that this is the first

4    case, this case we're here for today is the first case

5    in which you've testified as an expert on those

6    topics, correct?

7         A.   As I'm doing right now, yes.

8         Q.   And I asked you about others in which you

9    may have been consulted, and you've identified the

10   three cases that we just discussed, right?

11        A.   That's correct.

12        Q.   Are there any others that come to mind?

13        A.   Not that come to mind.  That doesn't mean

14   there might not have been others, but I don't believe

15   that there were any other items I was consulted on in

16   a legal sense about that was significant.

17        Q.   How long have you been in the business of

18   consulting as an expert witness?

19        A.   Probably about 35 years.

20        Q.   And how many matters would you estimate

21   you've worked on over that time?

22        A.   Probably about 70 or 80.

23        Q.   And how many times have you testified at a

24   deposition as an expert witness, in your estimation?

25        A.   This is an estimate.  Probably about 35 or